I'm going to start with the issue of the admission of Ms. Carla Cortes Nava's refusal to consent to a search of her vehicle just prior to her arrest in this case. That information was admitted on the testimony of officer sides at her trial, it wasn't just admitted but it was emphasized during that testimony, and it was also further emphasized and argued both in opening statement and in closing argument in this case. Without objection. That's true. We concede that we were on plain air as a result of that, Your Honor. And there was also, defense counsel brought it up during his examination of the officer, correct? He said After it was admitted, there was, I believe, a brief reference to it on cross examination. Yes, though it would be our position that once they opened on it and introduced it in direct examination, it would have to be addressed because it is the kind of information that a jury is almost certainly going to consider and making their conclusions. I think that the nature of the air here and the extent to which it was emphasized is what makes this plain and clear air for the court. There was some dispute and I want to start by trying to clarify the factual record with regard to the evidence that was actually admitted regarding the refusal to consent. In their response brief, the government attempts to cast the evidence that was admitted as merely admitting that Ms. Carla Cortez-Nava stated that she requested a ticket. First of all, we do dispute that characterization, the exact words that she said were, I just need my ticket, no question mark. But the reality is if you look at the entirety of that exchange between Ms. Cortez-Nava and officer sites, it's very clear that she invoked her right not to consent to the search of her vehicle. She was initially handed a consent to search form. After she was handed that consent to search form in response to questioning from the officer, she stated, I don't need you to be searching my car. The officer then followed up and said, and asked if she had any drugs in there. She said, no, there were no drugs in the car. And in response to that, he said, okay, well, no problem then. Meaning if there's no drugs in the car, there's no problem with me searching. And in response to that, she flatly stated, no. So if we assume that this was error and it was plain error, we still have to determine that the outcome of the proceeding would have been different, right? Because we're in plain error review. And there was no request for an instruction for the court to strike the testimony or do anything to try to cure it. But meanwhile, we have to decide that this error made a difference. And how can we reach that? I mean, the evidence seems pretty compelling. I would call it overwhelming that the jurors, if this hadn't been admitted, she wouldn't have been convicted. Yes, Your Honor. We do have to establish that there's a reasonable probability of a different outcome for the third prong of the plain error analysis. And I do think we can do that here. Certainly, the government did have some strong evidence, specifically the evidence that Ms. Cortez-Nava was observed present when the opaque black bags that were knotted were placed in the trunk of her vehicle. But I think this court should look to the similar factors that the court uses when analyzing Doyle error for that third prong. And those factors include the extent of the comments, whether the inference was stressed, and the weight of the evidence. So I think on both of those first two prongs, this is an unusually strong case for the defendant, given the repeated emphasis throughout the case on those things. But even when we get to the strength of the evidence in this case, I do think there's some additional context the court should take into consideration. First of all, in this case, one thing that's unique is that there is no dispute that Ms. Cortez-Nava never saw what was inside of those bags. There was aerial surveillance that shows that after the bags were placed in the trunk, the trunk was closed. Ms. Cortez-Nava never saw that. And in most cases, we don't have that information. If something's found in the car, there's kind of a presumption that person has access to all areas of the car and could have checked it to know what's in the vehicle. Furthermore, I think while there is significant evidence in the amount of drugs that was found in the vehicle, there was all of the evidence with regard to Ms. Cortez-Nava's mental state in terms of whether or not she knew what was in the bag were all based on inferences. And that was based on the fact that the government had this kind of extensive investigation. And I would say they have what in the trial court I would call a wide net problem. There was a lot of advanced technology that was used here. There was evidence of aerial surveillance of the vehicle. There was evidence that GPS trackers had been placed on cars. There was evidence of undercover officers. And none of that evidence involved Ms. Cortez-Nava. But the evidence showed that they had surveilled somebody selling drugs to an undercover officer. And that same person is the person that your client met in the parking lot, and he transferred the bags that contained nearly $900,000 worth of fentanyl into her car. But on top of that, there's also when the dog sniffed the car and alerted and then had probable cause to search, and they opened the bags and it was, in fact, fentanyl. And then they have the messages on one of her two cell phones that they have expert testimony describing that as negotiating drug sales. So that's pretty powerful evidence. I think your case really hinges on the court accepting all of your arguments so that the other evidence is excluded. But when that evidence comes in, then it's a lot of evidence that she wasn't an unwitting courier. These weren't drugs that were hidden in her vehicle and she came over the border, for example, and she didn't know they were there. These are drugs. This is material that turns out to be drugs that she knew was placed in the car. They have the photographs of her standing there by the opening with the known dealer putting these bags in her car. So I am having a hard time seeing that the fact that they surveilled her from the air or that there were trackers would somehow undercut the weight of the evidence. Well, I guess two points I want to address there. The first one is I think it was the defense's theory in part of their case that, yes, there was this person who the government has substantial evidence is involved in drug trafficking. In that he sold drugs to an undercover agent, right? That's pretty compelling evidence. Well, yes, he sold drugs to an undercover agent, and there was information about how that transaction took place, but there was no evidence with regard to Ms. Cortez-Nava in terms of any communications with that individual. They had both of the phones that were involved, and there was nothing to specifically indicate that she would have been aware of what was being sold. At trial, did she offer any explanation of why this known drug dealer deposited two large trash bags in her car, in the trunk of her car? Ms. Cortez-Nava did not testify, so there was no affirmative evidence with regard to an explanation. I do think that the prejudice here is buttressed by the admission of that 404B evidence that the court referenced specifically, the text messages, with an unknown number that took place about a month before the start of the charge conspiracy. That information, the defense did move to exclude that motion, was denied with regard to excluding that 404B evidence, and I don't think that there was sufficient evidence to establish that that could be evidence to show that she had knowledge of the drugs in the car a month later. The government essentially conceded that those messages were not related to this transaction. What were they related to? What was she discussing when she was discussing prices? Well, so I don't think we're disputing that it's certainly a possible inference from those messages that they were regarding drugs. The issue is whether that, if we assume that that's drug activity, as the government describes it, brokering drug prices. I think that's the worst interpretation for us in terms of incriminating evidence from it. If we assume that, we still have to ask the question under Rule 404B whether or not the government can establish a logical nexus to her knowledge of the drugs in this case that does not involve merely the propensity inference, that because she was involved in drug trafficking on this prior occasion, that she was involved in drug trafficking on this occasion. And I think there's some things here that distinguish this case from other cases where this court has found that prior drug evidence or drug transactions or crossings were proper 404B. There's very little evidence about what that transaction involved. The government's evidence is that it involved brokering, and there's a talk of numbers there. But in the other cases where this court has addressed 404B evidence, for example, like Jimenez-Chavez, the court focused on how the prior drug transaction was done. And it was situations where a defendant had previously crossed the border, placed their car in the same garage, and engaged in similar conduct to what was alleged in that case and had done it on multiple occasions. And the court's been very explicit that we have to talk about that how because otherwise we fall into the trap that we could just be engaging in an improper propensity inference. And here we don't know really much of anything about the how because we have about six text messages, and we don't know who they're with. And by the government's own explanation, it's supposed to be about brokering, not about transporting drugs. Well, it's about drug trafficking. So, I mean, for 404B, one of the exceptions to allow the evidence to come in is knowledge. And she's disputing knowledge. So the defense, I assume, was that these bags were placed in her car, but she didn't know what was in them, or she thought it was something else. But these messages from just a month before indicate that she was engaged in selling drugs. That would undercut her claim that she had no knowledge when she received $900,000 worth of fentanyl from a known drug dealer that it wasn't drugs. Well, Your Honor, our position is that the only way that it undercuts that is if you presume because she was involved in drug activity before, she was involved in drug activity now. All of the other cases that this court has affirmed this kind of 404B evidence is that this particular thing gave that person notice. So let's say, for example, if you were to say, okay, that prior transaction means she knows what methamphetamine looks like, or she has some sort of knowledge that would provide. Well, was it the same kind of drug? You're reminding me that I think there were two types of drugs in the vehicle. Was it meth and fentanyl? Yes. And the expert testified that they were discussing prices for a particular kind of drug? For meth is what the expert testified. So the inference was she was engaged in selling the same type of drug, so there's some similarity to the current offense. Yes. I mean, that is to say that it was the same type of drug, but I don't think that this court has ever approved the admission of 404B evidence merely on the fact that the person had a prior conviction or prior alleged conduct involving sale of the same type of drug. The mere fact that the person is engaged in selling a particular type of drug does not show that they have knowledge of what's inside of a sealed black bag in their trunk, particularly in a situation where there's no evidence that she looked inside the bag. So this was a question of like, oh, well, if she saw it, she would have known for sure what it was because she had some prior familiarity. But even that is not clear from the text messages because as the government describes it, this is about a series of seven text messages, according to them, about like brokering or trying to arrange some sort of sale. And so the other cases where this court has approved it has been where the defendant engages in the same kind of conduct. So crossing marijuana across the border has been admitted for crossing a different kind of drugs across the border to show familiarity with that cross-border process. Or somebody bringing in people or drugs by a panga boat has been admitted to show that they have familiarity of how to use a panga boat to navigate the waters. Here we don't have those kinds of similarities. We're talking about a different type of conduct, one brokering, one transportation, and we're talking about with different parties at least a month before the charge is conceded. Counsel, where did the defendant live, in San Diego? Yes. She mentions that in the transcript, here in Los Angeles, I get them for $1,200. So she's talking about drugs that somehow are in Los Angeles, not in San Diego, right? So can't you infer from that that she's dealing in drugs in Los Angeles? So I guess two points. One, I think the message that you're referring to is a message from the other party, not from Ms. Cortes-Nava, but we don't dispute that there is a reference to here in L.A. or something along those lines. But I don't think the mere, again, I think the mere engaging in drug activity at a location does not, unless you engage in a propensity inference, make it more likely that she has knowledge on a specific occasion a month later. Counsel, you're at about a minute. Did you want to reserve time? Yes. I'll give you a couple minutes. Good morning, Your Honors. May it please the Court, Mark Brady for the United States. I'm going to pick up where the defense left off with the 404B. As this Court knows, the district court has broad discretion to decide issues of 404B. It doesn't have to be as high a hurdle as the defense counsel is making it out. As the Court is well aware of the four-factor test, in this case, this defendant was found with 87 pounds of methamphetamine, that's wholesale quantities. And six weeks earlier, this text message was referencing the same wholesale prices for methamphetamine, was talking about her getting a commission. There was a reference to bringing it up to Los Angeles. With that level of similarity, it doesn't have to be any more so as the government's position. And what's interesting is that – Were there any evidence that she was transporting? Well, there's a reference at the end of that text message, can you bring it up to me. But your question, Your Honor, I wanted to make this point too. Usually with propensity evidence, there's a concern. This wasn't an arrest. All right, I see it. Date 92, can you bring it up? All right. This was not an arrest. This was not a conviction. For all we know, this deal may never have happened. Knowledge, as Judge Beatty pointed out, that is specifically in the text of 404B. This evidence actually had less of a propensity danger because it wasn't an arrest or conviction. But what it shows is that this defendant knows enough to be sophisticated enough about the prices in L.A., and she's heading to L.A. when she's arrested. She's talking about getting a commission. On that record, I don't think the district court can be said to have abused its broad discretion in allowing this evidence. And so shifting, unless the court has any further questions about the 404B, to get to the Prescott question. There was never, the defense had this evidence a long time ahead of trial. I don't believe the district court didn't notice any problem with it. We pointed out in our reply brief that judge, or I'm a judge, officer sides never testify that the defendant refused consent. And we're not trying to dance on the head of a pin here. There was only one specific question asked of him. In three excerpts of record 491, or 490, what did you do? I handed her a consent-to-search form. And then there is no talk about, well, did she say yes or no? In Prescott, the officers came to the defendant's apartment. They're looking through a glass window, and they said, you know, can we come in? And she says, do you have a warrant? They say no, and then she just stands there. And then they end up breaking down the door. In Gasho, the other case that the defense cites, which stands for the proposition of passive refusal, those two defendants, husband and wife, they actually refused to turn over aerial log books and said, you need a warrant. Here, the minute, you know, all that the defendant, or I'm sorry, all that officer sides testified, he said, once I gave her the form, she became evasive. She changed the subject. She asked, why do you want to look in the car? And then she started talking about wanting to have a ticket. But don't you think that could be construed, the jury could understand that she didn't consent as a comment on her declining the search? Well, this would be the government's position. Because of the plain error standard of view, this court has a well-settled principle that an error that hinges on a factual dispute cannot be plain or obvious as a matter of law. What the government would submit is that reasonable minds can differ. If it's ambiguous, you know, if I go into a restaurant and they know I like a burger and they say, you want a burger? And I say, hey, do you have fish as a special? That doesn't mean I don't want the hamburger. I'm just asking about something different. Here, she kind of shifts focus. And then on the reply brief, because in the opening brief, it was only about officer sides' testimony. When we pointed that out, then the defense in the reply brief said, oh, well, then let's look to the actual recording. And the parts that the defense quotes, well, you know, if this were true, I wouldn't have much credibility here. But, you know, what she says in pure Spanish, I don't need you to be checking my car, he immediately says, I don't understand. Then a few seconds later, he says, well, you don't have anything? So, no, no problem. And she just says, no, we would submit that's ambiguous. All we're saying is that this is not as clear-cut as Prescott and Gasho. And under the standard of view that the court is reviewing, again, to your point, it's possible that they might have thought that she wasn't consenting. But if it's not clear, if it's not so plain or obvious that an experienced district judge like Judge Robinson would be able to see it, nobody raised any objection about this. The government previewed it in an opening statement. It wasn't something that just came up as a collateral reference. We would just submit it's not plain error. But aside from those first two prongs of plain error review, the court has already gone over with defense. And we would submit that there is no reasonable likelihood of a different outcome. The evidence in this case, yes, it was circumstantial, but it was overwhelming. I mean, we've already talked about the fact that Polanco, the man with whom she met, unknown, he sold nine pounds of methamphetamine just nine days earlier. This wasn't just like, hey, let's meet up and have coffee. This was a two-minute trunk-to-trunk transfer of bags in a public parking lot. There's no formalities. There's no pleasantries. And then they immediately leave. And I know that the defense, their position at trial, they blame Polanco for having somehow duped the defendant. They want to stand on the fact that, well, they're black plastic bags. You can't see what's in them. But when the jury looked at that video, I mean, she's literally moving bags out of the way. I don't think this is the kind of evidence or argument that should give this court pause on plain error review, because you have to show a substantial prejudice. And then even during the stop, you know, the defendant, extreme nervousness, shaking hands, pulsing carotid, inconsistent answers on where she's going, inability to say where her destination was, even though there's a cell phone with a GPS in plain view. And on top of it, I know we talked under 404B a few minutes ago about that January 2021 text message. There were the other text messages that are not being challenged on appeal, and those are the ones with Luis's dad. Those were two days before, the day of, where Ms. Nava is literally saying, hey, do you have work? Do you have work? And then the morning of the arrest, Luis's dad says, call me. And then at 2 p.m., when she has the meeting, she's on her way to L.A., she's arrested at 3 p.m. Right after that, four missed calls from Luis's dad, call me, Carla, text. The other woman, Tony, sent her the map. On this record, Your Honor, the government would submit that that evidence was overwhelming. Who were Luis and the other woman? Were they ever identified? Was there any information about the individuals with whom she was texting? Not at trial. I believe post-trial, and, you know, this stuff was under seal, but this also brings me to my final point. I was just talking about the third prong of plain error view, even under the fourth prong. This defendant, when all is said and done, at the end of the day, after conviction, came clean and admitted knowledge. This Court has held that for purposes of the fourth prong of plain error view, this Court can look outside the record. The last two documents that I attached to the government supplemental excerpts of record show that in response for those admissions, the government gave a safety valve recommendation, which severely brought down the sentence. And so the government's point with that is simply, they're not only, you know, and I think during those submissions, Your Honor, I'm sorry, I think that was when there was more discussion of Luis's dad. But because that's not in the record, you know, I didn't put that into the supplemental excerpts, but I can't stand here and tell you that she did come clean, and we know that those text messages, even if she had never identified who those people were, you know, the timeline, there was a lot of talk about timeline and corresponding messages with real world events, when Luis's dad was suddenly trying to call her. Counsel, why are you telling us about what's not on the record? Well, because there was a question about whether Luis's dad was ever identified. So that's all I'm saying about that, Your Honor. But again, the point remains that the evidence would appear to be overwhelming, and for plain error review, there would be no grounds for reversal. So unless the Court has any further questions, I would yield the remainder of my time to the defense. Thank you. Thank you. He's got another six minutes and 20 seconds because the time has been yielded. I'm not going to. If only that were how it works. I want to just address two points. First, very quickly, the government continues to try to say that this was not a refusal to consent. The government itself repeatedly characterized it as a refusal to consent in the district court. And in their opening statement, they made it explicit. They said that when he asked the defendant to search her car for drugs, she asked him for a ticket and just to let her go. They explicitly connected that response that they repeatedly relied on throughout the trial to the request to search. They knew that was a refusal. That was everybody's understanding. So I don't think there's any plausible argument that it was not a refusal. I did want to just tag on to the last thing that was referenced in terms of that was the point I was trying to make earlier about the absence of information. The government's relying on these ambiguous text messages from Luis's dad and other things. And I think it's easy for us at this point to look at it and be like, okay, we're looking at all of this evidence. But from the jury's standpoint, they had this massive investigation. They had all of these tools. They had the air loose events and GPS trackers, but they were not able to provide any information really about Polanco in this trial or about the other Luis's dad or about where she was going. They had the phone and the GPS information. So I think that was additional information that in the absence of this error could have been argued to the jury to say that there was not sufficient evidence to prove beyond a reasonable doubt that she knew that the drugs were in the car. Thank you. Thank you. Thank you. Counsel, thank you both for your arguments this morning. They were very helpful, and this case is submitted.
judges: BEA, BADE, LEE